UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| HOTEL ASSOCIATION OF NEW YORK CITY, on behalf of itself and its members, | : | Case No.:   21 Civ. 8321 |
| | : | |
| Plaintiff, | : | |
| | : | **COMPLAINT** |
| v. | : | |
| | : | |
| CITY OF NEW YORK, and JOHN DOES 1-10 | : | |
| | : | |
| Defendants. | : | |

Plaintiff Hotel Association of New York City ("HANYC" or the "Association"), on behalf of itself and its members, by and through its attorneys, Reed Smith LLP, hereby files this Complaint against Defendant the City of New York ("City" or "New York City"), and against John Does 1-10, alleges as follows:

## NATURE OF THE ACTION

1.      In March of 2020, the COVID-19 pandemic shuttered New York City virtually overnight, as New York State and City officials rushed to blunt the deadly "first-wave" spike of the disease.  Businesses of all types and sizes were devastated by mandated quarantines and forced closures.  Among the hardest hit sectors was the City's 700-plus hotels, which were left reeling from international, national and local travel bans and mass cancellations of hotel-room bookings, as fear and uncertainty gripped a world unsure of when it would be safe to travel again.  And as hospitals overflowed with patients, the City turned to private hotels with their thousands of now-empty rooms to serve as shelters for the homeless, as well as to provide lodgings for infected first responders and other essential workers.

2.      Despite some rosy prognostications from some in government, the pandemic was not short-lived.  Even now, over a year and a half after the first wave, the City, along with the

rest of the country, struggles to regain a sense of normalcy.  The recovery has been halting and uneven, as vaccination rates have slowed and new, more virulent variants of the virus have led to setbacks.  Businesses and individuals are incrementally and tentatively returning to travel for business and pleasure.  Hotels around the city – that have survived thus far – are eager to reopen their doors and welcome back the public in a manner that is safe for visitors to the City and that will not lead to further setbacks.

3.      During this period, unprecedented action and aid from every level of federal to local government staved off the most dire consequences for both workers and businesses.  As the economy recovers and labor is in high demand, many of the extraordinary financial aid programs put in place by governments have come to an end or are set to expire.  Notably, on September 5, 2021, the Pandemic Unemployment Assistance program included in the federal Coronavirus Aid, Relief, and Economic Security ("CARES") Act, which provided $300 a week to unemployed workers, came to an end, as did the extension of New York State insurance benefits for workers laid off because of the pandemic.

4.      Less than a week later, in apparent response to the expiration of those benefits, a bill was introduced in the New York City Council ("City Council") requiring hotel owners to pay $500 in weekly severance payments to hotel employees that were laid off due to hotel closures or to "mass layoffs," for up to 30 weeks, unless the hotels meet the Law's stated criteria.  The hastily and poorly drafted bill flew through the City Council with few revisions – circumventing the standard process of debate and deliberation typical for a bill of this magnitude – and was signed into law by Mayor Bill DeBlasio on October 5, 2021, less than a month after its introduction, enacted as a Local Law in relation to severance pay for hotel service employees,

Int. No. 2397-2021 (the "Severance Law" or "Law").  The Law requires severance payments beginning on October 11, 2021.

5.      With this Severance Law, the City has taken upon itself the responsibility of creating a mandatory post-employment benefit plan for union and non-union hotel workers.  While the bill may be intended to compel hotels to reopen their doors to the public, the Law instead will likely cause many hotels to close permanently.  Those that stay open will need to set aside millions of dollars of reserves, and create large infrastructures, many out of whole cloth, to manage the financial assets in the reserves, determine the eligibility of employees for these additional severance benefits, and to assess what is owed to each individual employee.

6.      In total, HANYC projects that the Law will cost its members *over $150 million* in potential payments, given that the industry has been forced to lay off thousands of employees as a result of the pandemic.  And, when disputes arise over eligibility for severance payments, the Law directs employees to sue in state court, with the prospect of double damages and attorneys' fees.  Hotels, even those that are permanently closed, must establish infrastructures to manage the litigations, and face exorbitant legal costs.  This, after the industry had suffered from its worst year on record, and the American Hotel & Lodging Association declaring in July of 2021 that the New York City hotel industry was still in a "depression."[1]

7.      In its haste to enact the Severance Law, the City has run afoul of two fundamental principles of federalism and state–municipal relations.  *First*, because it requires hotel employers to establish and administer new employee benefit plans, the Severance Law is preempted by the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001 et seq. ("ERISA").  The Severance Law, as the title unmistakably denotes, is a "[plan] to pay employees severance

---

[1]      Report: 21 of Top 25 U.S. Hotel Markets in Depression or Recession, AHLA (July 1, 2021), https://www.ahla.com/press-release/report-21-top-25-us-hotel-markets-depression-or-recession.

benefits, which are payable only upon termination of employment, [and thus is an] employee welfare benefit [plan] within the meaning of the Act." *Massachusetts v. Morash*, 490 U.S. 107, 116 (1989). ERISA's preemption provision in 29 U.S.C. § 1144 provides that the federal law "supersede[s] any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." This provision, "conspicuousness for its breadth," clearly invalidates the Severance Law. *FMC Corp. v. Holliday*, 498 U.S. 52, 58 (1990).

8.     The Severance Law has all of the hallmarks of an employee benefit plan in that it, among other things, requires managerial discretion in its administration, creates in the reasonable employee a perception of an ongoing commitment by the employer to provide post-employment benefits, and compels the employer to analyze the circumstances of each employee's termination. The Law also requires employers to pay the severance benefits on an ongoing basis, which in turn creates the need for recurring tax withholdings, transmittals and reporting, as well as detailed coordination with the employers' payroll systems.

9.     Each hotel will need to, among other things, ascertain which employees were laid off due to a closure or mass layoff, whether that closure or mass layoff resulted from the pandemic, if the hotel has converted or "is in the process of" converting to an alternative use, whether employees were fired "for cause," or left voluntarily, or refused to return when recalled, decide which employees were "managerial, supervisory, or confidential employees," decide if payments must go to employees of vendors and concessionaires, locate long departed employees, determine the proper amount of payment owed to each employee based on separate benefit payments, and institute proper payment coding and tax withholding mechanisms corresponding to each severance payment.

10.     Equally fatal to the Severance Law are the prohibitions espoused by New York

State's Municipal Home Rule Law. *First*, the City lacks the authority to enact the Severance Law, because the Law falls outside the expressly enumerated categories of law in which municipalities are sanctioned to legislate. *See* N.Y. C.L.S. Mun. H. R. § 10.

11.     *Second*, the Severance Law is preempted by the State's comprehensive regulation in the sphere of labor law – particularly here as it relates to the governance of unemployment insurance benefits and it interactions with employee severance pay. *See Jancyn Mfg. Corp. v. County of Suffolk*, 518 N.E.2d 903, 905 (N.Y. 1987); *ILC Data Device Corp. v. County of Suffolk*, 588 N.Y.S.2d 845, 850 (N.Y. App. Div. 1992). As the Severance Law is intended to supplement the benefits that unemployed workers received under the state system, the City has disrupted the decision-making process that the State has engaged in to craft the unemployment laws and has impermissibly intruded on the State's jurisdiction.

12.     In sum, the City has dramatically overstepped its bounds. ERISA has a distinct and well-established set of rules and procedures for the sponsorship, administration, and management of employee benefit plans, and the State has well-defined areas of exclusive rule-making authority. The Severance Law causes exactly the sorts of problems that ERISA preemption and the Municipal Home Rule Law seek to prevent: the creation of differing and conflicting management plans that cause confusion and disruption for employers and employees. Permitting the Law to stand would run the risk of more, similar legislation that would create a patchwork of overlapping and potentially inconsistent governing laws.

13.     HANYC seeks a declaration that ERISA and New York State's Municipal Home Rule Law preempt the recently enacted Severance Law and also seeks injunctive relief to halt future enforcement of the Severance Law due to this preemption.

## PARTIES

14.     Plaintiff HANYC is a nonprofit trade association with its principal place of business in New York City, New York.

15.     HANYC is the oldest hotel association in the United States and one of the oldest trade associations in the nation.  The Association is an internationally recognized leader in New York City's $5 billion tourism industry and represents nearly 300 hotels, which, together, employ approximately 50,000 employees, which includes both union and non-union workers. The Association advocates on behalf of its members in a variety of legislative areas and sets standards for training, best practices and cooperative initiatives with key New York City stakeholders.  In addition, for its unionized member hotels, HANYC offers legal representation in labor-related matters, including contract negotiations, mediation and arbitration, and counsel for the Association provides all members with guidance in matters affecting employee-employer relations, labor relations, human resources matters, and applicable local, state and federal regulations.  The Association likewise retains the services of outside firms to monitor and review all pending state legislation, agency rules and regulations which affect its membership.

16.     Defendant City of New York (the "City") is a municipal corporation organized and existing under and by virtue of the laws of the State of New York (the "State").

17.     Defendants John Does 1-10 (hereinafter referred to as the "Employee Defendants") are defined under the Severance Law as "covered hotel service employees," and can make claims, directly or indirectly, for severance pay from HANYC's members pursuant to the Severance Law.  These defendants are as yet unknown by name and total number to HANYC; as the names of these persons become known, Plaintiff will amend the complaint accordingly.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

§ 1331 because this case raises questions arising under federal law and implicates the Supremacy

Clause in Article VI, Section 2 of the United States Constitution.  *See Shaw v. Delta Air Lines*,

463 U.S. 85, 96 n.14, 103 S.Ct. 2890 (1983) ("A plaintiff who seeks injunctive relief from state

regulation, on the ground that such regulation is preempted by a federal statute which, by virtue

of the Supremacy Clause of the Constitution, must prevail, thus presents a federal question which

the federal courts have jurisdiction under 28 U.S.C. § 1331 to resolve.").  The Court has

supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over the remaining state-law claims.

HANYC also seeks a declaration of its rights in this case of actual controversy pursuant to 28

U.S.C. §§ 2201 et seq.

19.     Venue is proper in this Court because the Severance Law was enacted by the New

York City Council and signed into law in this judicial district, the violations of HANYC's and its

members' rights occurred in this judicial district, the City is subject to this Court's personal

jurisdiction and is deemed to reside in this judicial district, the Employee Defendants are subject

to this Court's personal jurisdiction and many reside in this judicial district, and HANYC and

many of its members reside in this judicial district.

20.     HANYC has direct standing to pursue this action in its own name because it has

and will continue to suffer a direct and adverse impact from the enforcement of the Severance

Law.  Specifically, HANYC has had to divert and expend its resources in order to address the

harms posed by the Severance Law and educate its member companies on the implications of the

Law.  *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378-79 (1982); *Nnebe v. Daus*, 644

F.3d 147, 157 (2d Cir. 2011).

21.     HANYC also has standing to pursue this action on behalf of its member companies because (a) HANYC's membership includes employers with headquarters or a significant number of employees in New York who will suffer direct and adverse impact from the enforcement of the Severance Law and would otherwise have standing to sue in their own right; (b) the preemption interests that HANYC seeks to protect in this action are germane to and at the core of HANYC's mission; and (c) the relief sought (*i.e.*, injunctive and declaratory) does not require the participation of HANYC's individual member companies because it is based on legal and not factual grounds.  *See Faculty Alumni, & Students Opposed to Racial Preferences v. New York Univ.*, 2021 U.S. App. LEXIS 25501 (2d Cir. Aug. 25, 2021) (citing *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).

## FACTUAL ALLEGATIONS

### A.  The Global Pandemic Devastated the City's Hotel and Hospitality Industry.

22.     On March 11, 2021, the World Health Organization declared that the spread of COVID-19 was a global pandemic.  That same month, the federal government along with the State of New York and City of New York all declared states of emergency in an attempt to stop the spread of the virus.  These declarations included severe restrictions on overseas travel, the banning of most gatherings of individuals in New York, and the prohibition of dining in restaurants and bars.

23.     Inevitably, these restrictions, along with widespread fear of infection, severely curtailed travel for both business and leisure and had a devastating effect on the hotel and hospitality industry.  Hotel bookings were cancelled *en masse*, and new bookings ground to a virtual halt.  By April of 2020, the Bureau of Labor Statistics reported that the national hotel

industry had lost 7.5 million jobs.[2]

24.     New York City, as the national epicenter of the pandemic in its early days, was hit especially hard.  According to analysis by Smith Travel Research of the New York hospitality market, hotel occupancy cratered in the wake of the pandemic, falling from March 2019 levels of 80-plus percent to under 35 percent in March 2020.  Those numbers did not rise significantly throughout 2020 and never came close to the occupancy levels experienced by the hotel industry in 2019 or 2018.  In December of 2020, with a severe uptick in national COVID-19 cases during the peak holiday travel season, the occupancy rate for NYC hotel rooms was just 36%, a decline from 88% from the December prior.[3]  Whereas the City had expected to grow upon the more than 66 million trips to the City in 2019, the pandemic caused an estimated 66% drop in travel, to just 22.9 million visitors in 2020.  By the end of the year, 200 of the City's 700 hotels had closed their doors, either indefinitely or permanently.[4]  Revenue per available room ("RevPAR") plummeted from over approximately $220 per room, per night in 2019 to only approximately $70 in 2020, a decline of nearly 70%.  The City's hotels, which had employed about 55,000 people prior to the pandemic, operated with closer to 10,000 employees by the end of 2020.[5]  While the industry has made some recoveries in 2021, over the last twelve-month period, occupancy remained low at 48.8% as compared to 86.3% for the same period in 2019, with RevPAR at $78.87, compared to $221.41 in 2019.

25.     Congress and state and local governments reacted quickly with robust programs

---

[2]     Backman, Maurie, MillionAcres, An Iconic New York Hotel Is Closing Its Doors: What It Means for Real Estate Investors (Oct. 26, 2020), https://www.millionacres.com/real-estate-investing/articles/an-iconic-new-york-hotel-is-closing-its-doors-what-it-means-for-real-estate-investors/.

[3]     Backman, Maurie, USA Today, New York City Hotels Just Had Their Busiest Week Since the Start of the Pandemic (July 28, 2021), https://www.usatoday.com/story/travel/hotels/2021/07/28/nyc-hotels-just-had-their-busiest-week-since-the-start-of-the-pandemic/117667710/.

[4]     Sterling, Anna Lucente, Spectrum News 1 NY, What Happens To All of NYC's Empty Hotels? (Jan. 15, 2021), https://www.ny1.com/nyc/all-boroughs/news/2021/01/15/what-happens-to-all-of-nyc-s-empty-hotels-.

[5]     Sterling, supra.

to mitigate the burgeoning national and local unemployment crisis.  In March 2020, Congress passed the CARES Act, which extended eligibility for unemployment benefits for employees unable to work under the circumstances of the pandemic; unemployed or under-employed New Yorkers could apply for an additional 53 weeks of benefits beyond the 26 weeks already provided by the state, up to September 5, 2021.  The CARES Act further supplemented unemployment benefits for recipients by $600 a week from March 2020 to the end of July 2020, and a supplemental $300 a week from January 2021 to September, 5 2021.[6]

**B.  The City's Hasty Passage of the Severance Law Imposes Significant New Administrative and Financial Burdens on the Hotel Industry.**

26.      On September 9, 2021, days after several federal unemployment benefits programs had expired, New York City Councilman Francisco P. Moya introduced the proposed Severance Law to the City Council.  On September 15, 2021, the Committee on Consumer Affairs and Business Licensing held its first of two hearings on the bill, during which Councilman Moya, citing the recent loss of federal unemployment benefits, pitched the bill as a way to protect the livelihood of workers, while "incentiviz[ing] incremental reopening" of the hotel industry.[7]  On September 21, 2021, Mayor DeBlasio issued a "Message of Necessity," allowing for the bill's passage to circumvent the requirement that City Council members be allowed seven days to review a bill prior to passage.   The committee made final amendments to the bill on September 23, 2021 and it was passed on the same day by the City Council, without any significant input from hotel employers.  The bill was signed into Law by Mayor DeBlasio on October 5, 2021, and requires hotels to make severance payments beginning on October 11,

---

[6]      *See* Coronavirus Aid, Relief, and Economic Security ("CARES") Act, New York State Department of Labor, https://dol.ny.gov/coronavirus-aid-relief-and-economic-security-cares-act (last visited Oct. 8, 2021).
[7]      Committee on Consumer Affairs and Business Licensing, 9/15/2021 3:00 PM, The New York City Council, https://legistar.council.nyc.gov/MeetingDetail.aspx?ID=891818&GUID=A6A7D0BB-4328-4598-8C9A-5A051B643283&Options=&Search= (last visited Oct. 8, 2021).

2021.

27.     The Severance Law is draconian, yet light on details.  It requires some of the

hardest hit hotels – *i.e.* those that (1) have laid off more than 75% of their staff in any 30-day

period, or (2) are closed to the public and have not recalled 25% of their employees by October

11, 2021, and opened to the public by November 1, 2021 – to pay eligible employees $500 per

week in severance pay for up to 30 weeks.  With $500 payments to up to 30,000 laid-off

employees for thirty weeks, the Law potentially increases costs for the already staggering

industry by hundreds of millions of dollars.

28.     The Severance Law also lays out numerous, vague requirements, compelling hotel

employers to engage in mental gymnastics and subjective interpretations to ensure that they have

met their obligations under the Law for each employee.  As summarized below, hotel employers

will have to make difficult decisions and calculations to determine eligibility and what is

ultimately owed to each individual employee.

29.     The Severance Law defines a "covered hotel service employee" as one who was

"employed" by a hotel on March 1, 2020 for at least a year to perform "hotel service" and was

"not a managerial, supervisory or confidential employee."  "Hotel service" is unhelpfully defined

as "work performed in connection with the operation of a hotel."  The treatment of employees

who were terminated for cause is undefined.  So is how to treat employees who left voluntarily,

or were recalled and declined to return, or work for vendors or concessionaires.  There are also

decisions regarding what constitutes a "managerial, supervisory or confidential employee," as

the Law fails to define these terms.

30.     Additionally, the requirement to pay severance does not apply to hotels that have

"closed permanently" and have "converted or [are] in the process of converting to an alternative

use," but the Law provides no guidance on what qualifies as a permanent closure or what is needed to initiate the "process of conversion."  Adding to the confusion and administrative burden, with respect to hotels "converted or . . .  in the process of converting to an alternate use," hotel owners must pay severance under the Law unless, "every covered hotel service employee at such hotel is offered severance pay specifically for such conversion in an amount that equals no less than pay for 20 days per year of service, at the same rate that such employee is paid for paid days off."

31.    Nor is it clear whether hotels that have closed under circumstances other than COVID-related issues are covered.

32.    The Severance Law provides for the reduction of the $500 weekly payments to employees to account for severance pay or other "similar pay" owed to employees in that same week, but leaves open what might count as "similar pay."  Hotels will have to ascertain, whether each employee has or will receive payments that would reduce the $500 commitment under the Law.

33.    To interpret the myriad undefined aspects of the Severance Law, hotel owners will need to exercise discretion and good faith.  If disagreements arise regarding the hotels' decisions, the Severance Law provides that a covered employee can sue in a New York State Supreme Court action and potentially recover double damages and attorneys' fees.  This remedy conflicts with ERISA, exposes hotels to potentially thousands of state court suits, and requires that they create an infrastructure to defend and finance this litigation.

34.    Finally, as the Severance Law creates ongoing requirements until the Law expires on June 1, 2022, employers will need to set aside substantial reserves and establish and maintain administrative systems, to calculate and monitor the payments on a weekly basis.  Hotels will

either have to expand their administrative departments, or build them from scratch.

**C. The Severance Law is Preempted by ERISA.**

35.     Congress enacted ERISA to regulate any employee benefit plan established or

maintained by a private employer or employee organization nationwide.  29 U.S.C. § 1003(a).

While not guaranteeing substantive benefits, Congress sought to encourage the creation of

employee benefit plans and "'to create a system that is [not] so complex that administrative

costs, or litigation expenses, unduly discourage employers from offering [ERISA] plans in the

first place.'"  *Conkright v. Frommert*, 559 U.S. 506, 517 (2010) (quoting *Varity Corp. v. Howe*,

516 U.S. 489, 497 (1996)).  "ERISA 'induc[es] employers to offer benefits by assuring a

predictable set of liabilities, under uniform standards of primary conduct and a uniform regime

of ultimate remedial orders and awards when a violation has occurred.'"  *Id.* (quoting *Rush

Prudential HMO, Inc. v. Moran*, 536 U.S. 355, 379 (2002)).

36.     Uniformity in the regulation and administration of ERISA plans was paramount to

Congress.  "'Requiring ERISA administrators to master the relevant laws of 50 States and to

contend with litigation would undermine the congressional goal of "minimiz[ing]" the

administrative and financial burden[s]" on plan administrators – burdens ultimately borne by the

beneficiaries.'"  *Gobeille v. Liberty Mut. Ins. Co.*, 136 S. Ct. 936, 944 (quoting *Egelhoff v.

Egelhoff*, 532 U.S. 141, 149-50 (2001)).

37.     With this purpose in mind, Congress enacted ERISA's preemption section, which

states the expansive preemptive effect of the statute, providing that: "the provisions of

[ERISA] . . . shall supersede any and all State laws insofar as they may now or hereafter relate to

any employee benefit plan described in section 1003(a) and not exempt under section 1003(b)."

29 U.S.C. § 1144(a).  ERISA defines "employee benefit plan" broadly as an "employee welfare

benefit plan or an employee pension benefit plan or a plan which is both," and "State law[s]" are defined to include "all laws, decisions, rules, regulations, or other State action having the effect of law, of any State," with "State," in turn, including "a State, any political subdivisions thereof, or any agency or instrumentality of either, which purports to regulate directly or indirectly, the terms and conditions of employee benefit plans covered by [ERISA]." *Id.* § 1144(c)(1)-(2).

38.     Accordingly, "ERISA preempts all state laws insofar as they relate to employee benefit plans, even laws which are 'a help, not a hindrance,' to such plans, and regardless of whether there is a 'comfortable fit between a state statute and ERISA's overall aims.'" *Simas v. Quaker Fabric Corp. of Fall River*, 6 F.3d 849, 852 (1st Cir. 1993) (quoting *McCoy v. MIT*, 950 F.2d 13, 18, *cert. denied*, 504 U.S. 910 (1990)).  "'[A] law "relates to" an employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to such a plan.'" *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 8 (1987) (quoting *Shaw v. Delta Airlines, Inc.,* 463 U.S. 85, 96-97 (1983)).  Moreover, "a state statute that obligates an employer to establish an employee benefit plan is itself preempted even though ERISA itself neither mandates nor forbids the creation of plans." *Simas*, 6 F.3d at 852 (citing *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 140 (1990)).

39.     The Supreme Court has described the language of ERISA's preemption provision as "conspicuous for its breadth," *FMC Corp. v. Holliday*, 498 U.S. 52, 58 (1990), and "deliberatively expansive," *Cal. Div. of Lab. Standards Enf't v. Dillingham Constr., N.A.*, 519 U.S. 316, 324 (1997) (quoting *Morales v. TWA*, 504 U.S. 374, 384 (1992)).  The Second Circuit has echoed the Supreme Court, explaining "Congress intended the definition of 'employee welfare benefit plan' to be broad and independent of the specific form of the plan." *Okun v. Montefiore Med. Ctr.*, 793 F.3d 277 (2d Cir. 2015).

40.     "[P]lans to pay employees severance benefits, which are payable only upon termination of employment, are employee welfare benefit plans within the meaning of the Act." *Massachusetts v. Morash*, 490 U.S. 107, 116 (1989).  A severance plan is governed by ERISA – and triggers ERISA's preemption clause – if it requires an ongoing administrative program or scheme.  *See, e.g., Okun*, 793 F.3d at 279 (citing *Schonholz v. Long Island Jewish Med. Ctr.*, 87 F.3d 72, 75 (2d Cir. 1996)).

41.     The Second Circuit has identified three non-exclusive factors to help determine whether a required undertaking "involves the kind of ongoing administrative scheme inherent in a plan, fund or program."  *Okun*, 793 F.3d at 279:

> (1) whether the employer's undertaking or obligation requires managerial discretion in its administration; (2) whether a reasonable employee would perceive an ongoing commitment by the employer to provide employee benefits; and (3) whether the employer was required to analyze the circumstances of each employee's termination separately in light of certain criteria.

*Id.* (citing *Tischman v. ITT/Sheraton Corp.*, 145 F. 3d 561, 566 (2d Cir. 1998)).

42.     The Severance Law forces hotels to establish employee benefit plans and detailed administrative programs, and further obligates the ongoing use of managerial discretion in their operation.  Below is a non-exhaustive summary of some of the issues hotels will have to blindly navigate in connection with their obligations under the Severance Law.

###     i.      Covered Employees

43.     Hotels have to determine who qualifies for payments under the Law, which turns on a number of open-ended factors.  Only employees who were laid-off as a result of a "closure" or "mass layoff" are eligible for severance pay, and therefore the hotel must "determine whether an employee left voluntarily or was terminated [and] it must determine whether the termination was 'for cause,'" which presumably would not qualify the employee for payments.  *See Okun*,

793 F.3d at 280; *see also Tischmann*, 145 F.3d at 567 (applying ERISA to plan that "clearly contemplates application of significant managerial discretion, and case-by-case analysis of each termination").  Although, "[i]t may be that in some instances, a determination of eligibility [will] be straightforward . . . in others, the employer [will] have to make its own judgment . . . [and,] in all events . . . the employer [will] have to maintain records, apply the 'for cause' criteria, and make payments or dispute the obligation."  *Simas*, 6 F.3d at 853.

44.     While eligible employees must have been employed for a year prior to March 1, 2020, the hotel must determine whether their work was "performed in connection with the operation of [the] hotel," and the Law offers no guidance on how to account for seasonal, off-site, casual, extra, substitute or part-time employees.  Likewise, the Law fails to illuminate what constitutes a "managerial, supervisory, or confidential employee," who is not be eligible for severance payments.  There are numerous positions that do not neatly fit into "employee" and "management" categories.  Hotels will have to parse through tens of job descriptions of each of their employees, and their own systems of classification for union and non-union workers, to determine who are eligible for payments.

45.     Who counts as a "confidential employee" is subject to further analysis and discretion.  Dozens of employees at a hotel may be given access to confidential or sensitive information.  Human resource departments will have access to confidential employee information; accounting and sales representatives will have access to proprietary information concerning hotel contracts with various organizations and venues; front desk clerks will have access to confidential customer information.  Hotels will need to determine what quantum of access to confidential information is enough to make someone a "confidential employee."

46.     Then there is the issue of vendors and concessionaires who, for example, provide

services to hotels and operate bars, restaurants, valet, coat check and night cleaning services in hotels.  Some of these have joint operations with the hotels.  Some workers are not on the hotel payroll, but have been at the hotel for years and potentially perform "work performed in connection with the operation of a hotel."  It is also unclear whether a hotel would need to factor them into their overall employee count to determine if it experienced a 75% reduction to constitute a mass layoff, or had reached the 25% recall threshold to relieve itself from liability under the law.

47.     Once hotels figure out who is a "Covered hotel service employee," they must then undertake to locate these workers for whom they may or may not have contact and payment information.

### ii.     Closures, Mass Layoffs and Re-Openings

48.     The Law also requires hotels to make determinations with regard to their status vis-à-vis the public.  The Law covers employees laid-off from a hotel's "closure" but fails to meaningfully define the phrase.  Hotels will have to determine whether partial closures, such as the closure of a restaurant or several floors, qualify laid-off employees for benefits.  Further, the Law excuses hotels from making payments which have "closed permanently and [have] converted or [are] in the process of converting to alternative use," but again, the Law fails to state what triggers an event of a permanent closure or when the process of conversion begins.  It will be up to the hotels to make that determination, and again, the analysis if rife with complications.  A hotel will have to determine whether its board beginning to discuss potential conversion opportunities is part of the "process of converting," or how selling off part of its property for residential use affects its obligations to employees under the Severance Law.

49.     The question of the whether a closure is permanent is ambiguous.  There is no

bright-line rule in making such a determination, and the length of the closures due to COVID-19 are difficult, if not impossible to discern, and largely out of the control of the employer.

50.     Likewise, a formerly closed hotel will also have to account for when it has reached the 25% of recalled employees threshold needed to end its obligations under the Severance Law.  If a hotel offers to recall an employee who then declines to return to work for whatever reason – whether it be that they have relocated and have not returned, or else have declined for medical reasons – the hotel will have to decide whether that employee should be counted towards the 25% threshold or if it must move on to the next employee down the list until 25% of employees have agreed to resume employment.  The Law is also entirely unclear over how to account for vacillations in employee retention over time.  For instance, if a hotel at one point had closed, reopened with 25% of staff, but then subsequently laid off employees, again falling below 25%, it is uncertain how the Law would treat the obligations of the hotels.  Further, it is unclear whether a hotel that did not close, but instead faced a "mass layoff," can escape payments by hiring more than 25% of its staff back.

51.     Similarly, Hotels have to calculate whether terminations "result[ed] in a layoff by a hotel employer during any 30-day period of 75 percent or more of the employees engaged in hotel service at a hotel as of March 1, 2020." vThis will require an aggregation of layoffs over various periods of time, and will implicate the same concerns respecting which employees to count, and recalls and vacillations in employee retention, discussed above.

52.     Nor is it clear whether hotels that have closed under circumstances other than COVID, such as for fire, flooding or need to make repairs, are also required to pay employees pursuant to the Severance Law.  Indeed, some hotels that have been dormant for over a year and a half have water or mold damage and cannot reopen to transient guests by November 1, 2021

out of concern for public safety.

### iii.    Severance or Similar Pay

53.     The Severance Law also reduces the amount of payments owed to each individual employee "by the amount of any severance or similar pay provided or owed for such week to such employee by the hotel employer."  What constitutes "similar pay" is vague, but likely broad.  Hotels will have to determine which employees are receiving payments, and whether these payments should be deducted from the $500 weekly payments per the Severance Law.

### iv.    Employee Expectations

54.     In addition to requiring managerial discretion on the part of the hotels, the Law likewise creates the perception from the employee's perspective of an ongoing commitment by the employer to provide employee benefits.  It provides for payments for up to 30 weeks, or until the employee is no longer laid off, and until the expiration of the Law on June 1, 2022, evincing a clear requirement to provide ongoing benefits, which employees will perceive as such.

### v.    Financial Reserves and Processing

55.     The complexity of the decision-making required by the Severance Law will "create a need for financial coordination and control," *Fort Halifax Packing Co.*, 482 U.S. at 12, and force hotels to not only set aside funds to ensure they can meet the Law's obligations, but also build and maintain administrative systems to adequately manage their new responsibilities. Hotels will have to set up coding parameters to track employee payments, implement tax withholding mechanisms, ensure that the hotel has the latest contact information for eligible employees (a difficult task after employees have been laid off for up to 18 months) and coordinate the hotel's assets so that it allocates funds appropriately to comply with the Law while fulfilling its other obligations.

56.     Such funding and administration will extend to the handling of potential state Supreme Court litigation—with the prospect of double damages and attorneys' fees—by unsatisfied employees.  Hotels could face thousands of state court suits that would require appropriate administrative teams and financial reserves.

**vi.     Continued Monitoring**

57.     Even after eligibility and the amount of pay owed are initially determined for an employee, the hotels must continue to monitor eligibility on an individual basis, as the Law requires payments to employees for each week that such "employee remains laid off."  This requires hotels to determine whether employees who are subsequently recalled, but decline to return, or are employed elsewhere are still eligible to receive severance pay.   *Cf. Tischmann*, 145 F.3d at 567 (applying ERISA to plan which "contemplated an ongoing relationship between [the employer] and covered employees," wherein employees could lose entitlement to benefits during the period of receipt of benefits).

**D.  The Severance Law is Invalid Under New York's "Home Rule" Law.**

58.     Under New York law, local municipalities such as the City are limited in their authority to enact legislation.  The state's Municipal Home Rule Law, N.Y. C.L.S. Mun. H.R. § 10 limits local governments in New York State to enacting legislation that relates to delineated subjects set forth in that section, while § 11 enumerates specific limitations on local legislation. In addition, the New York State Court of Appeals has expounded upon these parameters, explaining that "although the constitutional home rule provision confers broad police powers upon local governments relating to the welfare of its citizens, local governments may not exercise their police power by adopting a law inconsistent with the Constitution or any general law of the State. . . .   A local law may be ruled invalid as inconsistent with State law not only

where an express conflict exists between the State and local laws, but also where the State has

clearly evinced a desire to preempt an entire field thereby precluding any further local

regulation." *Jancyn Mfg. Corp. v. County of Suffolk*, 518 N.E.2d 903, 905 (N.Y. 1987).  Because

the City both lacks the authority to enact the Severance Law and because the Law is inconsistent

with the general laws of New York State, the Severance Law is void and unenforceable.

59.     First, the Severance Law fails to relate to any subject delineated under § 10.

While the statute broadly allows for legislation relating to the "government, protection, order,

conduct, safety, health and well-being of persons or property therein," N.Y. C.L.S. Mun. H.R.

§ 10(1)(ii)(a)(12), stretching the meaning of this subsection to cover a law which requires

severance payments from business to individuals would be to read the grant of local authority so

expansively as to render the other grants of authority, as well as the limitations on authority set

forth in the Municipal Home Rule Law, superfluous and meaningless.

60.     Second, the Severance Law is preempted by New York State's extensive

legislation in the field of labor and employment rights.  "[T]he enacting of the comprehensive

regulatory scheme embodied in the Labor Law and the vesting of broad rule-making and

enforcement authority in the Commissioner of Labor of the State of New York" evince an intent

by the state legislature to occupy the entire field of regulation." *ILC Data Device Corp. v.

County of Suffolk*, 588 N.Y.S.2d 845, 850 (N.Y. App. Div. 1992).  Principally relevant here, the

state has enacted a comprehensive unemployment insurance scheme for the benefit of its

citizens.  Article 18 of the New York Labor Law provides for the establishment of an

unemployment insurance fund and regulates how the fund is managed.  N.Y. C.L.S. Labor §§

550-51.  The Law further regulates contributions made by employers to the fund, including

prescribing the rate at which employers shall make contributions and the time and method of

such contributions.  *Id.* § 570.  Additionally, it defines the eligibility criteria for unemployed

New Yorkers to receive benefits, the process through which unemployed residents may make

claims, and the schedule of benefits afforded to claimants.  *See id.* §§ 590-596.

61.     In enacting the Severance Law, the City clearly intended to supplant the State's

unemployment insurance program.  The Severance Law mirrors the way that the State's

unemployment insurance program functions.  Payments are made to laid-off employees for a set

number of weeks, may be reduced by other forms of compensation that the employee receives

simultaneously, see *id.* § 591, and end once the employee is rehired.  In fact, State law

specifically addresses severance pay in the context of unemployment benefits, reducing such

benefits when severance rises above the maximally allowed weekly benefit rate.  *Id.* § 591(6).

Councilman Moya cited the end of federal unemployment benefit programs in introducing the

Severance Law bill before City Council, and as Councilman Kalman Yeger stated in opposing it,

"I believe in calling things what they are.  This is not a severance bill; it is an unemployment

bill . . . [and as such] we are preempted by State labor law."[8]

62.     In singling out one industry in particular and its employees for disparate

treatment, the City undermines the careful policy choices of the State's legislation.  It augments

the liability of hotel employers beyond that contemplated by statute, while effectively expanding

eligibility to unemployment benefits to a small subset of the unemployed:  For example, the

Severance Law requires that severance pay to laid-off hotel workers be paid for up to 30 weeks

regardless of what unemployment benefits or severance pay has already been received, whereas

state unemployment insurance covers the beneficiary for 26 weeks.  And although the maximum

---

[8]     Committee on Consumer Affairs and Business Licensing, 9/23/2021 10:00 AM, The New York City
Council, https://legistar.council.nyc.gov/MeetingDetail.aspx?ID=895349&GUID=A3CFF9AC-DC61-45B7-984C-
F936A442D472&Options=ID|Text|&Search=severance (last visited Oct. 8, 2021).

weekly benefit for a claimant in New York is $504, the Severance Law essentially replicates that amount for laid-off hotel employees.

63.     Regardless of the wisdom of these choices at a time where national unemployment remains above average despite a high demand for labor, the state legislature clearly intended through its sweeping regulation of the field of unemployment benefits to provide uniform rules for New York residents.  The Severance Law circumvents this intention and therefore is preempted.  *See also Aetna Cas. & Sur. Co. v. County of Nassau*, 221 A.D.2d 107, 119 (N.Y. App. Div. 1996)  ("Where the State has clearly evinced a desire to preempt an entire field, any overlapping local regulation should be struck down, as tending to inhibit the operation of the State's transcendent scheme and thwart the implementation of the State's overriding policies.").

### FIRST CAUSE OF ACTION
### (Declaratory Relief – ERISA Preemption)

64.     HANYC realleges and incorporates by reverence Paragraphs 1 through 6364 above.

65.     ERISA preempts state and local laws that "relate to" ERISA plans.  29 U.S.C. § 1144(a).  State and local laws that have a "reference to" or "connection with" ERISA plans "relate to" them and are preempted.  *Gobeille*, 136 S. Ct. at 943.  Further, "a state statute that obligates an employer to establish an employee benefit plan is itself preempted even though ERISA itself neither mandates nor forbids the creation of plans."  *Simas*, 6 F.3d at 849.

66.     The Severance Law enacted by the City, and enforceable by the Employee Defendants, obligates hotel employers to establish an employee benefit plan as it requires hotels to create an "ongoing administrative scheme."  *Okun*, 793 F.3d at 279.

67.     The Severance Law requires significant managerial discretion on the part of the

hotel employer in administrating severance payments. For instance, employers must make determinations as to which employees meet the eligibility requirements for severance payments under the Law, as to whether the hotel has permanently closed and is in the process of conversion to alternative use so as to be exempt from making payments, and as to whether "similar" payments can be deducted from owed severance payments.

68.     The Severance Law creates the perception of an ongoing commitment by the employer to provide employee benefits by requiring weekly payments to be made for up to 30 weeks.

69.     The Severance Law requires the hotel employer to analyze the circumstances of each employee's termination separately in light of certain criteria. Hotel employers must determine how long each employee worked for the hotel prior to termination – and in what capacity – to determine eligibility to severance payments. Likewise, a hotel employer needs to determine whether an individual employee was terminated as a result of a closure of mass layoff.

70.     Accordingly, the City's Severance Law should be declared void as preempted and unenforceable by ERISA.

### SECOND CAUSE OF ACTION
### (Injunctive Relief – ERISA Preemption)

71.     HANYC realleges and incorporates by reverence Paragraphs 1 through 63 above.

72.     Employee Defendants, and/or their agents and representatives, should be enjoined from enforcing the Severance Law because it is preempted by ERISA.

73.     If enforced, the Severance Law will cause HANYC and its members to suffer irreparable harm for which there is no adequate remedy at law because HANYC and its members will be subject to a law that is invalid and preempted by ERISA and will be compelled to incur the cost of compliance with an invalid law.

74.     Without injunctive relief, the harm of HANYC and its members cannot be adequately compensated by monetary damages and the harm will continue to compound until the Severance Law expires in June of 2022.

75.     The balance of equities between HANYC and Defendants and the overall public is served in favor of an injunction.

### THIRD CAUSE OF ACTION
### (Declaratory Relief – "Home Rule" Preemption)

76.     HANYC realleges and incorporates by reference Paragraphs 1 through 63 above.

77.     The state's Municipal Home Rule Law, N.Y. C.L.S. Mun. H.R. § 10 limits local governments in New York State to enacting legislation that relates to delineated subjects set forth in that section.

78.     The Severance Law does not relate to any of the subjects described in § 10 of the Municipal Home Rule Law.

79.     Further, local governments may not exercise their police power by adopting a law inconsistent with the Constitution or any general law of the State, and such laws may be ruled invalid as inconsistent with State law where the State has clearly evinced a desire to preempt an entire field, thereby precluding any further local regulation.

80.     The State of New York has enacted through legislation a comprehensive program for unemployment insurance.  The program evinces the intent of the State to preempt the entire field of regulation in relation to unemployment benefits.

81.     The Severance Law attempts to undermine the uniformity of those rules by altering the liabilities and benefits of employers and employees in the City's hotel industry.  For example, it requires additional payments by hotel employees beyond the unemployment insurance contributions that state law requires employers to make.  It also expands the benefits of

certain laid-off hotel employees, in terms of both the amount of benefits and duration of coverage, beyond what they would otherwise be entitled to under state law.

82.     Accordingly, the City's Severance Law should be declared void and unenforceable as preempted by New York's Municipal Home Rule Law.

**FOURTH CAUSE OF ACTION**
**(Injunctive Relief – "Home Rule" Preemption)**

83.     HANYC realleges and incorporates by reverence Paragraphs 1 through 6382 above.

84.     Employee Defendants, and/or their agents and representatives, should be enjoined from enforcing the Severance Law because it is preempted by New York's Municipal Home Rule Law.

85.     If enforced, the Severance Law will cause HANYC and its members to suffer irreparable harm for which there is no adequate remedy at law because HANYC and its members will be subject to a law that is invalid and preempted by state law and will be compelled to incur the cost of compliance with an invalid law.

86.     Without injunctive relief, the harm of HANYC and its members cannot be adequately compensated by monetary damages and the harm will continue to compound until the Severance Law expires in June of 2022.

87.     The balance of equities between HANYC and Defendants and the overall public is served in favor of an injunction.

**WHEREFORE, HANYC respectfully requests that this Court:**

a.     Declare, pursuant to 28 U.S.C. § 2201, that ERISA preempts the City's Severance Law and that it is unenforceable;

b.     Declare, pursuant to 28 U.S.C. § 2201, that the State of New York's

Municipal Home Rule Law invalidates the City's Severance Law and that it is unenforceable;

        c.      Enjoin Employee Defendants, and/or their agents or representatives, from implementing or enforcing any present of future requirements under the Severance Law; and

        d.      Grant HANYC and its members such additional relief that this Court may deem appropriate.

Dated: October 8, 2021                Respectfully submitted,

                                        REED SMITH LLP


                                        */s/ Steven Cooper*
                                        Steven Cooper
                                        Colin Underwood
                                        Zachary Kaye
                                        Brian Giunta
                                        599 Lexington Avenue, Floor 22
                                        New York, NY  10022-7650
                                        Telephone: +1 212 521 5400
                                        Facsimile: +1 212 521 5450

                                        *Counsel for Plaintiff*